UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CATHERINE OWENS,

Plaintiff,

v.

THE CITY OF NEW YORK
DEPARTMENT OF EDUCATION and
NADAV ZEIMER,

Defendants.

17-Cv-519 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Catherine Owens, a teacher at Harlem Renaissance High School, brings this action against the former principal of Harlem Renaissance, Nadav Zeimer, and the New York City Department of Education ("DOE"). Owens contends that she faced discrimination, retaliation, and a hostile work environment based on her protected actions and characteristics, in violation of federal and state civil rights law. Both defendants have moved for summary judgment. For the reasons set forth below, those motions are granted, and judgment shall enter in favor of the DOE and Zeimer.

I. BACKGROUND

A. 2009–2010 School Year

Owens began working as a Spanish teacher at Harlem Renaissance in 2009. (DOE Rule 56.1 Statement ¶ 5, ECF No. 68.) Owens reported to Mary Rice Boothe, who then served as Harlem Renaissance's principal, for her first school year. (*See id.*)

The parties dispute whether Owens's performance during this first year was satisfactory. The DOE points to a letter that Rice Boothe had written after she observed Owens's class in which Rice Boothe stated that "vocabulary work took a long time." (*Id.*) Owens contends the letter also contained "significant praise of her lessons" and correctly notes that Rice Boothe ultimately deemed the lesson "Satisfactory." (Owens Rule 56.1 Resp. ¶ 5.)

The DOE also claims that, during this time, Owens exhibited "time and attendance issues"; Owens acknowledges these issues but notes that she "was not disciplined for her time and attendance by Rice-Booth" and that, in fact, "Rice-Booth recommended [Owens] for tenure." (*Id.* ¶ 6.)

1

### B.  2010–2011 and 2011–2012 School Years

In 2010, defendant Zeimer took over as principal of Harlem Renaissance. (DOE Rule 56.1 Statement ¶ 12.) Sometime thereafter, Owens and Zeimer's relationship began to deteriorate. The parties agree that the turning point in their relationship was March 2012, when Zeimer held a meeting with Owens and her union representative and raised concerns about Owens arriving late, missing staff meetings, failing to sign in each morning, and missing deadlines. (DOE Rule 56.1 Statement ¶ 18; Owens Rule 56.1 Resp. ¶ 18.) During that meeting, Owens disclosed that she suffered from hidradenitis suppurativa[1] and attention deficit hyperactivity disorder (ADHD), which "negatively affected her processing of time and led to her forgetting at times to sign in in the morning." (Owens Rule 56.1 Resp. ¶ 18.) To address this issue, Zeimer agreed to begin "call[ing] [Owens] in the morning to 'support her in being on time to school.'" (DOE Rule 56.1 Statement ¶ 38.)

At the end of the 2011–2012 school year, Owens received her annual performance evaluation, which gave her a "satisfactory" rating. (*Id.* ¶ 20.) Notably, however, the phrase "[m]ay lead to adverse rating" was written on the evaluation form, right next to the box for "[a]ttendance and punctuality." (Annual Professional Performance Review at 1, Kamen Decl. Ex. Q, ECF No. 67-17.)

### C.  2012–2013 School Year

In August 2012, Zeimer organized "professional development training" for Harlem Renaissance High School teachers at Hunter College. (DOE Rule 56.1 Statement ¶ 21; *see also* Owens Dep. at 73:6–9, Kamen Decl. Ex. A, ECF No. 67-1.) This training exacerbated the tensions between Zeimer and Owens.

Part of the training was administered by an organization called "Educators Intensive," which "is a [DOE] approved vendor that provides professional development for schools." (Owens Rule 56.1 Resp. ¶ 21 (alteration in original).) Zeimer was responsible for hiring Educators Intensive—he and the founders of Educators Intensive had previously attended courses offered by a company called the "Landmark Forum." (*Id.* ¶ 21.)

The parties hotly dispute the exact nature of Landmark. The DOE claims that "Landmark is a company that offers 'professionally focused training' that 'charges' hundreds, if not thousands, of dollars for its 'coursework.'" (DOE Rule 56.1 Statement ¶ 29.) By contrast, Owens asserts that Landmark is a more generalized self-help organization that

---

[1] According to Owens's complaint, hidradenitis suppurativa "is a chronic skin condition that [causes] pea to marble sized or larger lumps to form under [Owens's] skin. These lumps, in addition to being painful, can break open and drain pus." (Compl. ¶ 12, ECF No. 1.)

intends to "help you have a better life . . . [i]n every sense" and "is designed to b[r]ing about positive, permanent shifts in the quality of your life." (Owens Rule 56.1 Resp. ¶ 29.)

At the training, which Owens did not attend, Zeimer participated in an exercise during which he read aloud a letter discussing his relationship with Owens. (DOE Rule 56.1 Statement ¶¶ 23–24.) The DOE contends that the letter emphasizes Owens's poor performance during this time, while Owens maintains that the letter shows Zeimer's bias against Owens based on her asserted disabilities. (*Id.* ¶ 24; Owens Rule 56.1 Resp. ¶ 24.)

According to Owens's deposition, Zeimer's oral reading of the letter received a mixed reception. Owens claimed that some of her fellow teachers "felt uncomfortable" and "[t]hat it was very apparent that he was talking about [Owens]." (Owens Dep. at 82:16–17, Kamen Decl. Ex. A, ECF No. 67-1.) Since the training, Owens said, the letter had been "brought up numerous times" and "became kind of a joke . . . about being broken or a mess." (*Id.* at 82:5–9.) Owens also admitted, however, that others "didn't even know he was referring to [her]" and at least one teacher "appreciated that [Zeimer] owned his part in the problem, that he had failed [Owens] as a manager." (*Id.* at 83:2–7.)

A few weeks later, Owens confronted Zeimer about the letter. (*See* Owens Rule 56.1 Resp. ¶ 25.) Zeimer apologized and explained that the letter was part of an exercise in which "participants were to 'own part of their problem they were having with somebody.'" (DOE Rule 56.1 Statement ¶ 25.) Zeimer also said that the "letter was more about [him] than her, and it was about [his] leadership." (*Id.* (alteration in original).)

On January 19, 2013, Zeimer invited members of his staff to a Landmark course. (*Id.* ¶ 28.) He circulated an email identifying teachers who were and were not attending the course. (*Id.* ¶ 30.) Owens declined to attend. (*Id.*)

Less than two weeks later, on February 1, Zeimer and then-assistant principal Ahmed Edwards held a meeting with Owens and her union representative to discuss "concerns . . . regarding [her] professional performance." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. F, ECF No. 67-6 [hereinafter Feb. 2013 Letter]; *see also* DOE Rule 56.1 Statement ¶ 31.) According to a letter Zeimer wrote memorializing that meeting, Zeimer noted thirteen times Owens had arrived late to work, "many more occasions" when Owens was "significantly late to the morning meeting," and two instances Owens was "significantly late for [her] Regents proctoring assignments." (*Id.*) The letter also flagged that Owens was late in turning in at least one assignment. (*Id.*) The letter emphasized that these issues had been raised in March 2012, almost a year prior, and that Zeimer had "worked with [Owens] for most of that school year to address the same concerns." (*Id.*) Further, the letter warned that Owens was "at risk of receiving an unsatisfactory rating" for the 2012-2013 school year. (*Id.* at 2.) Owens disputes that she was consistently late. (Owens Rule 56.1 Resp. ¶ 31.)

The letter concluded with certain remedial measures that Zeimer would undertake to allow Owens to "focus on fewer responsibilities more effectively." (Feb. 2013 Letter at 2.) Zeimer determined that, among other things, Owens would no longer serve as the coordinator of student affairs at Harlem Renaissance and that Owens's classroom would be subject to regular visits to "monitor [her] attendance." (*Id.*)

Later that month, Zeimer conducted an observation of Owens's classroom. Zeimer rated the lesson "unsatisfactory," noting in his observation report that the class spent "nearly 30 minutes of passive watching" a Spanish film with English subtitles. (Observation Report at 1, 3, Kamen Decl. Ex. S, ECF No. 67-19.) According to Zeimer's report, Owens herself acknowledged that "this was a poor lesson," (*id.* at 2), because, according to Owens, she was "expecting to have [her] classes covered by a substitute since the photographer was at school for picture day and [Owens was] managing this event"; Owens therefore "'dumbed down' the lesson so that the substitute could teach it." (*Id.* at 2.) Zeimer noted, however, that Owens "never requested coverage" for a substitute teacher and that she "continued watching the film and did not make any adjustments" to the lesson "when [she] actually taught the lesson [her]self." (*Id.*)

Zeimer's report further emphasized that Owens "ha[d] received more support and less accountability than any other teacher," such as "more professional development days than any other teachers," her "own office space to support [her] needs for a quiet place to focus," and weekly meetings "to review lesson plans and provide support." (*Id.* at 2–3.) Zeimer concluded by warning that "if these intensive supports [did] not improve [her] classroom experience in a consistent way, Owen could "expect to receive an unsatisfactory rating for [the 2012-2013 school] year." (*Id.* at 3.)

On March 6, 2013, Zeimer and Edwards again met with Owens and her union representative to discuss "continuing concerns . . . regarding [her] professional performance." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. U, ECF No. 67-21.) Zeimer noted that "an ongoing pattern of unprofessional conduct continue[d] to demand that [he] rate [her] performance as unsatisfactory at this time." (*Id.*) Zeimer noted that, among other things, Owens was late to or missed meetings and failed to meet a "grade entry" deadline. (*Id.* at 1–2.)

The next month, April 2013, Zeimer again conducted an observation of Owens's classroom, this time accompanied by the school superintendent. (DOE Rule 56.1 Statement ¶ 40.) Zeimer rated the lesson "ineffective," noting that Owens's Spanish 4 class appeared to reuse "EXACTLY the same material [she was] covering in the Spanish 2 class." (Instructional Expectations at 4–5, Kamen Decl. Ex. W, ECF No. 67-23.)

In May 2013, Zeimer once more observed Owens's classroom. (Id. ¶ 41.) In his observation report, Zeimer first revisited his April 2013 observation with the

superintendent, writing that he "was shocked at the poor performance [in April] given that [Owens] had known for over a month that the superintendent would be visiting that day and conducting classroom visits." (Informal Observation Report at 1, Kamen Decl. Ex. X, ECF No. 67-24.) Turning to the May 2013 observation, Zeimer emphasized that the "challenge/level of [Owens's] assignments" was severely lacking and that Zeimer was "left to wonder if [her students] ha[d] learned anything yet this term." (*Id.* at 2.) "[N]one of the feedback you have received all year," Zeimer concluded, "appears to impact your daily practice." (*Id.* at 3.) Zeimer again rated the lesson "unsatisfactory." (*Id.*)

About a month later, Owens filed a complaint with the DOE's Office of Equal Opportunity (OEO), alleging "inappropriate comments based on race, ethnicity, disability, and sexual orientation." (DOE Rule 56.1 Statement ¶ 43.)

When the 2012-2013 school year concluded, Owens received an overall "unsatisfactory" (or "U") rating for the year; her review noted that she had an "overwhelming number of days late" and "evidence of poor instruction," among other things. (*Id.* ¶ 44; *accord* Annual Performance Review at 1, Kamen Decl. Ex. AA, ECF No. 67-27.) According to Owens, as a result of her "U" rating, she "was told she could not apply to work summer school and receive overtime." (Owens Dep. at 188:21–189:7.) Approximately one week after the "U" rating was issued, Zeimer followed up with a short letter in which he noted that her "performance . . . ha[d] declined since [the March 2013] meeting." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. G, ECF No. 67-7.)

Supported by her union, Owens appealed the "U" rating to the DOE's Office of Appeal and Reviews. (DOE Rule 56.1 Statement ¶ 46.) The appeal was denied, and the rating was sustained. (*Id.* ¶ 47.)

### D.   2013–2014 School Year

At the beginning of the next school year, Zeimer and Edwards issued a performance improvement plan to Owens. The plan noted that Zeimer and Edwards were "deeply concern[ed] about [her] lack of effective instruction during the 2012–2013 school year" and emphasized five "pedagogical deficiencies": (1) "[u]nsatisfactory attendance and punctuality," (2) "[u]nsatisfactory attitude and Professional Growth," (3) "[i]neffective in providing a wholesome classroom atmosphere," (4) unsatisfactory in making lessons interesting to pupils, and (5) "[i]neffective in your attention to routine matters." (2013–2014 Action Plan at 1, Kamen Decl. Ex. DD, ECF No. 67-30 [hereinafter Action Plan].)

The plan further stated that Owens would receive five forms of support: (1) "[w]eekly planning and instructional support meetings with Assistant Principal Edwards and CFN Instructional Facilitator Russ Gonzalez," (2) "[a]s needed support meetings with content specific coaching with a Foreign Language Assistant Principal," (3) "[b]imonthly meetings

with the Assistant Principal," (4) "[i]nter-visitations to classroom of teachers both within [Harlem Renaissance] and in other schools," and (5) "[b]iweekly meetings to review culminating assignments and activities." (*Id.*)

In October 2013, Edwards conducted an observation of Owens's class and gave Owens a mixed evaluation, rating the class as "[developing] with [Ineffective] attributes to this lesson." (Evaluator Form at 3, Kamen Decl. Ex. EE, ECF No. 67-31 (alterations in original).) Edwards noted that "[t]here [were] a number of significant areas that must be addressed with regards to [Owens's] pedagogy." (*Id.*) He also wrote, however, that he was "confident that someone as conscientious as [Owens would] do everything in [her] power to integrate the above suggestions into [her] daily teaching routine." (*Id.*)

Things did not, however, improve from there. Instead, in December 2013, Zeimer held a meeting with Owens and her union representative, during which he "discuss[ed] continuing concerns . . . regarding [Owens's] professional performance in the following area: ongoing lateness including missing morning staff meetings." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. FF, ECF No. 67-32.) Owens claims that many of these statements were "inaccurate and false." (*Id.*)

In late January 2014, Zeimer again met with Owens and her union representative, this time to discuss "following school regulations; meeting deadlines; use of professional periods and tutoring time." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. H, ECF No. 67-8.) Zeimer noted several instances of concern, including Owens's late arrival to a midday professional development session with Zeimer and one incident during which Owens "walk[ed] out of the building . . . during tutoring time" and "did not return." (*Id.*) Owens disputes these allegations. (Owens Rule 56.1 Resp. ¶ 54.)

The next month, after observing Owens's classroom, Zeimer rated Owens as "Ineffective" (DOE Rule 56.1 Statement ¶ 55) and was sharply critical of her performance. According to Zeimer, Owens offered very little instruction during the class and instead engaged in "teacher-student-teacher-student rapid-fire questioning without much response from students." (Evaluation Form at 4, Kamen Decl. Ex. GG, ECF No. 67-34 [hereinafter Feb. 2014 Evaluation].) Zeimer continued, "I find it shocking that in a 54 minute lesson you did no more than discuss a picture and have a native Spanish speaker read a 69 word paragraph." (*Id.*) Further, Zeimer noted, Owens appeared to "not have any lesson plan and had no activity for students to complete." (*Id.* at 7.) Owens does not dispute most of Zeimer's criticism but claims only that she "had submitted a lesson plan as required." (Owens Rule 56.1 Resp. ¶ 55.)

At the conclusion of the 2013–2014 school year, Owens received a "developing" rating for her performance that year—one level higher than "unsatisfactory," but still considered an "adverse" rating. (DOE Rule 56.1 Statement ¶ 57; *see* Annual Performance Review at 2;

Zeimer Dep. at 88:3-19.) Because this was an improvement from the prior year's rating, her union opted not to appeal the determination. (*Id.*)

Around the same time, however, Zeimer conducted a meeting with Owens and her union representative to discuss "continuing concerns . . . regarding [her] attendance and ongoing failure to follow directives/protocols with respect to professional development and . . . professional assignments." (Letter from Nadav Zeimer to Catherine Owens at 1, Kamen Decl. Ex. I, ECF No.67-9.) Owens disputes several of these issues, but she does not appear to contest at least two assertions: that she had been repeatedly late to morning meetings and that she had missed an "end of the year conference, arriving an hour late without acknowledging or appearing to be at all troubled with having missed the meetings." (*Id.*)

### E.   2014–2015 School Year

At the beginning of the next school year, 2014-2015, Zeimer and Edwards met again with Owens and her union representative "to discuss [Owens's] 'time and attendance issues.'" (DOE Rule 56.1 Statement ¶ 59.) During the meeting, Owens's union representative "indicated that [Owens] had shown improvement in her alleged time and attendance issues, but . . . Zeimer . . . refus[ed] to recognize this improvement." (Owens Rule 56.1 Resp. ¶ 59.)

In November and December 2014, Zeimer conducted two additional meetings with Owens and her union representative to flag continuing issues relating to Owens's attendance and punctuality. (DOE Rule 56.1 Statement ¶¶ 63, 66.) Around the same time, Owens requested that Zeimer provide a letter of recommendation for her to attend a course at Touro College. (*Id.* ¶ 65.) Zeimer declined to write her a recommendation, concluding that the course "would get in the way of [her] professional duties[,] [and] . . . in light of how he perceived [her] performance that he did not want to recommend [her] for the program." (*Id.* (alterations in original).)

Meanwhile, evaluations of Owens's performance continued. In October 2014, Edwards observed Owens's class and rated her performance as "ineffective." (*Id.* ¶ 60.) Later that month, a fellow teacher, Onida Cruz, conducted a more informal observation and noted that "[s]tudents used negative language in the class," that Owens's "role of promoting students' discourse was not seen," and that "[t]he learning environment was not conducive for student learning." (*Id.* ¶ 62.)

Then, in December 2014, Zeimer and Edwards conducted an observation of Owens's class and "rated her performance as exhibiting 'ineffective' and 'developing' attributes." (*Id.* ¶ 67.) Zeimer expressed his concern as follows: "After many months . . . of meeting with Mr. Edwards one or more times a week, professional development sessions, visits to other

schools, I see no evidence that you are applying any of those learning opportunities in your classroom." (*Id.*) Finally, in February 2015, Zeimer conducted yet another observation of Owens's class and rated her performance as "ineffective," writing that Owens was late to her class and "covered almost no Spanish language content" during the lesson. (*Id.* ¶ 68.)

The next month, March 2015, Owens received disciplinary charges in accordance with section 3020-A of the New York Educational Law (*id.* ¶ 69), the statute setting forth the process by which a tenured teacher in New York State may be terminated. *See* N.Y. Educ. Law § 3020-A. As part of the 3020-A process, Owens was reassigned to PS 125, another school based in Harlem. (DOE Rule 56.1 Statement ¶ 69.)

In June 2015, Zeimer provided Owens with a "letter to file about [her] attendance issues" and her "neglect of duties, failure to follow policies, procedures, or directives and failure to fulfill [] professional responsibilities." (*Id.* ¶ 70.)

At the end of the year, Owens received an "ineffective" rating for her work during the 2014–2015 school year. (*Id.* ¶ 71.) She appealed the rating and ultimately entered into a settlement with the DOE, under which the DOE would change her "ineffective" rating to a "no rating" and Owens would withdraw her appeal and waive all legal claims arising out of the 2014–2015 annual rating. (*Id.* ¶ 72; Owens Rule 56.1 Resp. ¶ 71.)

### F.   2015–2016 and 2016–2017 School Years

In December 2015, the 3020-A charges against Owens were withdrawn, a decision Zeimer disagreed with. (DOE Rule 56.1 Statement ¶¶ 73, 76.) Owens was informed that she was eligible to either be reinstated as a teacher at Harlem Renaissance or join the absent teacher reserve ("ATR"). (*Id.* ¶ 74.) Around the same time, Owens was offered a position to teach Spanish at another school, but she declined the offer. (*Id.* ¶ 75.)

In January 2016, Owens returned to work at Harlem Renaissance, where she began co-teaching classes with other teachers. (*Id.* ¶ 78.) Around the same time, Owens filed a second complaint with the OEO, alleging disability discrimination by Zeimer (*id.* ¶ 77), and in March 2016, she filed a similar discrimination complaint with the New York State Division of Human Rights. (*Id.* ¶ 80.)

Owens ultimately received a "no rating" for her performance during the 2015–2016 school year. (*Id.* ¶ 81.) At the beginning of the 2016–2017 school year, Owens requested that she be allowed to "teach in one classroom or on one floor," or for "a cart if [she was] not to get a classroom." (*Id.* ¶ 83.) Zeimer denied her request for a single classroom or floor but granted the request for a cart. (*Id.*; Owens Rule 56.1 Resp. ¶ 83.) A few months later, Owens commenced this litigation.

## II. Discussion

Owens brings the following four categories of claim against the DOE and Zeimer: (1) religious discrimination in violation of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; (2) disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the NYSHRL, and the NYCHRL; (3) unlawful retaliation in violation of the ADA, Title VII, section 1983, the NYSHRL, and the NYCHRL; and (4) hostile work environment in violation of the ADA, Title VII, the NYSHRL, and the NYCHRL.[2]

Following discovery proceedings, each defendant moved for summary judgment on all of Owens's claims, raising three principal arguments. First, defendants claim that the majority of Owens's allegations are barred by the applicable statute of limitations. Second, defendants contend that Owens's discrimination and retaliation claims fail as a matter of law, because Owens has not made out a prima facie case and, in any event, any adverse employment action she suffered was based on legitimate, nondiscriminatory reasons. Third, defendants contend that Owens's allegations do not, as a matter of law, establish a hostile work environment.

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019). Still, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys*, 426 F.3d at 554 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). To survive a motion for summary judgment, then, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

---

[2] Pursuant to this Court's partial grant of defendants' prior motion to dismiss the complaint, Owens brings her ADA and Title VII claims against only the DOE, not Zeimer. (Order, ECF No. 26.)

## B. Statute of Limitations

Owens brings claims under five statutes: (1) Title VII, (2) the ADA, (3) 42 U.S.C. § 1983, (4) the NYSHRL, and (5) the NYCHRL. For statute-of-limitations purposes, these claims fall under three categories.

The first category includes Title VII and ADA claims, which are subject to two separate time limitations: one for the exhaustion of administrative remedies (i.e., the filing of a charge with an administrative agency), and one for the filing of the lawsuit itself. Here, the determinative time limit is that for the exhaustion of administrative remedies. A charge must be filed with an administrative agency within 180 days of the alleged unlawful employment practice or—as here—within 300 days if the employee "initially instituted proceedings with a State or local agency with authority to grant or seek relief." 42 U.S.C. § 2000e-5(e)(1); *see also id.* § 12117(a) (adopting Title VII's procedures for purposes of the ADA).

Owens filed her administrative charge with the State Division of Human Rights on March 18, 2016, which means that any claims arising out of discrete acts before May 23, 2015 (i.e., 300 days before March 18, 2016) are time-barred. (*See* DOE Mem. at 3; DOE Rule 56.1 Statement ¶ 80.)

The second category includes section 1983 claims, which in New York are subject to a three-year limitations period. *See Patterson*, 375 F.3d at 225. Owens filed suit on January 24, 2017. (*See* Compl.) Thus, any section 1983 claims that accrued before January 24, 2014, are barred by the statute of limitations. (*See* DOE Mem. at 3.)

The third category consists of NYSHRL and NYCHRL claims filed against the DOE and its officers, which are subject to a one-year statute of limitations. *See* N.Y. Educ. Law § 3813(2-b); *see also Amorosi v. S. Colonie Indep. Cent. Sch. Dist.*, 9 N.Y.3d 367, 369 (2007) ("[T]he clear and unambiguous language of Education Law § 3813(2-b) provides that the statute of limitations on [a workplace discrimination] claim is one year."). Thus, Owens's NYSHRL and NYCHRL claims that accrued before January 24, 2016, are barred by the statute of limitations. (*See* DOE Mem. at 3.)

An exception to this limitation exists for claims alleging so-called "continuing violation[s]." *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004). A prime example is a claim for a hostile work environment, which by its "very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Such a violation "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* In that case, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an

10

act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105.

## C.  Discrimination and Retaliation Claims

Owens brings three categories of claims alleging discrimination and retaliation: (1) religious discrimination under section 1983, Title VII, the NYSHRL, and the NYCHRL; (2) disability discrimination under the ADA, the NYSHRL, and the NYCHRL; and (3) retaliation under section 1983, the ADA, Title VII, the NYSHRL, and the NYCHRL.

Although these claims have various statutory bases, all are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[3] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation. *See id.* at 802. If the plaintiff makes out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Id.* Once the defendant does so, the plaintiff can prevail only if she can show that the defendant's "stated reason . . . was in fact pretext." *Id.* at 804.

Defendants contend that Owens has failed to establish a prima facie case of discrimination on the basis of religion or disability and for retaliation. And even if such a prima facie case were established, they urge, the record demonstrates that any adverse action taken against Owens was based on legitimate nondiscriminatory and nonretaliatory reasons. Thus, in defendants' view, Owens's claims for discrimination and retaliation fail as a matter of law.

### 1.  Religious Discrimination

Owens has raised religious discrimination claims based on four statutes: (1) 42 U.S.C. § 1983, (2) Title VII, (3) the NYSHRL, and (4) the NYCHRL. Under all four statutes, Owens's religious discrimination claims do not survive summary judgment. As discussed below, there is insufficient evidence in the record from which a reasonable jury could conclude that Owens has established a prima facie case or that her employer's nondiscriminatory reasons for its actions were pretextual.

---

[3] *See McDonnell Douglas,* 411 U.S. at 802–04 (Title VII); *Naumovski v. Norris,* 934 F.3d 200, 214 (2d Cir. 2019) (section 1983); *McMillan v. City of New York,* 711 F.3d 120, 125 (2d Cir. 2013) (ADA); *Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir. 2010) (per curiam) (NYSHRL and NYCHRL).

### a. *Owens has not established a prima facie case*

Usually, to establish a prima facie case of discrimination, an employee must show that she "(1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination." *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir. 2003). Here, however, Owens does not allege that she was discriminated against because of her membership in a protected class; rather, she claims discrimination based on *Zeimer's* purported "religious" beliefs—namely, his participation in Landmark.

Although the Second Circuit has not squarely confronted this issue, other federal courts—including district courts in this circuit—have generally accepted that this type of conduct may give rise to a religious discrimination claim. *See, e.g., Noyes v. Kelly Servs.,* 488 F.3d 1163, 1168 (9th Cir. 2007); *Shapolia v. Los Alamos Nat. Lab.,* 992 F.2d 1033, 1038 (10th Cir. 1993); *EEOC v. United Health Programs of Am., Inc.,* 213 F. Supp. 3d 377, 392 (E.D.N.Y. 2016) (Matsumoto, J.). "Such a claim is often referred to as a 'reverse religious discrimination' claim." *United Health,* 213 F. Supp. 3d at 392.

For a reverse religious discrimination claim, "the 'protected class' element is not comparable because [the plaintiff] does not claim she was part of a protected class, i.e., that she adheres to a particular religion." *Noyes,* 488 F.3d at 1168. As a result, courts have held that a "modified version" of the prima facie inquiry is appropriate: a plaintiff must demonstrate that "(1) she was qualified for the position . . . ; (2) her employer subjected her to an adverse employment action; and (3) some additional evidence supports the inference that the adverse action was taken because of a discriminatory motive based on the employee's failure to adopt or follow the employer's religious beliefs." *United Health,* 213 F. Supp. 3d at 406.

Here, defendants contend that Owens has failed to establish a prima facie case of religious discrimination for three reasons: (1) because she did not suffer an adverse employment action, (2) because Landmark is not a religion, and (3) because she cannot establish a causal connection between any adverse action and her nonparticipation in Landmark.

For the reasons set forth below, the Court agrees that Owens has failed to establish a prima facie case, as she has demonstrated neither any adverse employment action within the statute of limitations nor any causal nexus to her nonparticipation in Landmark.[4]

---

[4] The Court accordingly will not dip its toes into the waters of whether Landmark may be considered a religion for these purposes.

i.   Owens did not suffer an adverse employment action within the
statute of limitations

"To constitute an adverse employment action . . . a change in working conditions must
be 'materially adverse.'" *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51 (2d
Cir. 2002) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000)). The same
is true under section 1983 and the NYSHRL. See *Vega v. Hempstead Union Free Sch. Dist.*, 801
F.3d 72, 89 (2d Cir. 2015) (section 1983); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456,
466 (2d Cir. 2001) (NYSHRL).

By comparison, to establish an adverse employment action under the NYCHRL, "the
plaintiff need only show that her employer treated her less well, at least in part for a
discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110
n.8 (2d Cir. 2013). In other words, "a plaintiff must simply show that she was treated
differently from others in a way that was more than trivial, insubstantial, or petty." *Williams
v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011) (Scheindlin, J.).

Here, Owens offers four categories of actions she claims are adverse: (1) the pay freeze
that resulted from her 2012–2013 "U" rating; (2) the denial of overtime that also resulted
from her "U" rating; (3) "a change in duties and job reassignment" after she filed 3020-A
charges; and (4) "an atmosphere of adverse actions" resulting from the combined effect of
various actions taken by Zeimer. (Owens DOE Opp'n at 6–7.)

The first two categories, which pertain to the "U" rating Owens received for the 2012–
2013 school year, are barred by the statute of limitations. As set forth above, Owens can sue
for actions that occurred only after specific cut-off dates due to the applicable statutes of
limitations, Owens *See supra* Section II.B. As relevant here, the three dates are May 23, 2015,
for her Title VII and ADA claims; January 24, 2014, for her section 1983 claims; and January
14, 2016 for her NYSHRL and NYCHRL claims. Owens's "U" rating was received years
before any of these limitations dates.

The third category stems from her 3020-A disciplinary charges, which were received in
March 2015. According to Owens, after the 3020-A charges against her were withdrawn,
"Zeimer made her a substitute teacher, and directed her to co-teach classes other than
Spanish, rather than return her to her own classes." (Owens DOE Opp'n at 7.) For the
reasons noted above, this change in job duties is time-barred for Owens's Title VII, ADA,
NYSHRL, and NYSHRL claims.

Because Owens's section 1983 claims have a cut-off date of January 24, 2014, her 2015
change in job duties could survive summary judgment if a reasonable jury could conclude
that the change was materially adverse. But no reasonable jury could in fact do so.

*Galabya v. New York City Board of Education*, 202 F.3d 636 (2d Cir. 2000), provides clear guidance for this type of alleged adverse action. In *Galabya*, a teacher sued after he was assigned to teach a class for regular students instead of one for special education students, which he had previously taught. *Id.* at 638–39. The Second Circuit held that the teacher had not suffered an adverse employment action, noting that "the record [was] insufficient to permit the inference that this transfer constituted an adverse employment action." *Id.* at 640. Ultimately, *Galabya* noted, for a mere transfer to constitute an adverse employment action, "the plaintiff must show that the transfer created a 'materially significant disadvantage.'" *Id.* (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)). Here, the Second Circuit noted, "[t]here [was] no evidence detailing what responsibilities [the teacher] performed during his years as a special education teacher" or "what particular expertise he developed during those years, [or] how the transfer impacted on that expertise." *Id.* Thus, the court held, "summary judgment was properly granted on the ground that appellant failed to create a genuine issue of material fact on the issue of whether his reassignment . . . was an adverse employment action." *Id.*

Here, just as in *Galabya*, no evidence exists that would allow a reasonable jury to conclude that Owens's reassignment was a materially adverse action. Thus, Owens's change in job duties does not establish an adverse employment action.

Finally, Owens argues that the totality of actions undertaken by Zeimer created an "atmosphere of adverse actions." (Owens DOE Opp'n at 7.) Owens points to various actions including, among other things, the oral reading of his letter at the Educators Intensive workshop and Zeimer's disciplinary letters and negative observation reports. (*Id.*) It is true that "the atmosphere of adverse acts analysis has been used in Title VII cases in this circuit." *Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 574–75 (S.D.N.Y. 2009). The relevant standard is borrowed from First Amendment retaliation claims, for which a "plaintiff must show that . . . the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002). Even in the aggregate, however, the actions that Owens alleges do not give rise to an "unreasonably inferior and adverse" working environment. *Id.* Thus, Owens cannot establish an adverse employment action on this theory either.

In short, the actions of which Owens complains are either time-barred or not materially adverse. She therefore cannot establish the first prong of a prima facie case of reverse religious discrimination.

14

> ii. Owens has not produced evidence supporting the inference that
>     any adverse action suffered was taken because of her
>     nonparticipation in Landmark

To establish a prima facie case of reverse religious discrimination, the employee must offer "some additional evidence [that] supports the inference that the adverse action was taken because of a discriminatory motive based on the employee's failure to adopt or follow the employer's religious beliefs." *United Health,* 213 F. Supp. 3d at 406. The inference can be drawn based on various factual circumstances, including "the employer's criticism of the plaintiff's performance in religiously degrading terms, more favorable treatment to employees subscribing to the religious beliefs of the employer, or the 'sequence of events leading to the plaintiff's [adverse employment action].'" *Id.* at 408 (quoting *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir. 2001)).

Here, defendants claim that, even if Owens suffered an adverse employment action, she has failed to demonstrate that any adverse action occurred because of her nonparticipation in Landmark. In response, Owens argues that such a link can be inferred from two circumstances: (1) that she received a disciplinary letter in February 2013, "[l]ess than two . . . weeks after declining Zeimer's invitation to attend a Landmark session" in January 2013, and (2) that "[o]ther teachers . . . were late as often as Owens, or committed misconduct, but were not disciplined." (Owens DOE Opp'n at 9–10.) Neither circumstance, however, supports an inference of discriminatory motive.

For the reasons noted above, the disciplinary letter cannot be considered an adverse employment action. But even if it could, the circumstances surrounding the letter do not support an inference of discrimination. It is true that "[a] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001) (alteration in original) (quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996)). But the February 2013 letter was not the first disciplinary letter she received. To the contrary, the parties agree that Owens had been warned about performance issues such as attendance and punctuality as early as March 2012, well before her nonparticipation in Landmark. (DOE Rule 56.1 Statement ¶ 18; Owens Rule 56.1 Resp. ¶ 18.)

Second, Owens has produced absolutely no evidence that similarly situated employees were treated more favorably. "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself. *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.

1997)). Owens names three teachers—Samuel Ayeni, Zena Waudjou, and Joy Yearwood—
but has provided nothing other than her own unsupported and conclusory assertions to
establish that those teachers were similarly situated in all material respects to her. (Owens
DOE Opp'n at 10; *see also* Owens Rule 56.1 Resp. ¶ 7.)

> b.  *Owens cannot show that defendants' nondiscriminatory reasons for their*
> *actions were pretextual*

Once a plaintiff makes out a prima facie case, the burden shifts to the defendant "to
articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*,
411 U.S. at 802. Once such a reason is articulated, the plaintiff must show that the "stated
reason . . . was in fact pretext"—that is, that discrimination was a motivating factor for
defendants' actions. *Id.* at 804. She may do so "by demonstrating weaknesses,
implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate,
nonretaliatory reasons for its action." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir.
2013).

Defendants contend that, even if Owens had made out a prima facie case of reverse
religious discrimination, there were nondiscriminatory reasons for any adverse actions she
suffered—"her lateness and absences, her failure to arrive to mid-day assignments on time,
her inability to meet internal deadlines, and her documented sub-par performance"—and
she cannot show that those reasons were pretextual. (DOE Mem. at 18.)

Owens offers little in response, claiming only that the disciplinary letters were "based
upon falsehoods" and "were in violation of the CBA." (Owens DOE Opp'n at 10.) She does
not, however, identify which portions of the letters she says are false and offers no evidence
that they are. Local Civil Rule 56.1 provides that "[e]ach statement by the movant or
opponent pursuant to Rule 56.1(a) and (b), *including each statement controverting any*
*statement of material fact*, must be followed by citation to evidence which would be
admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civ. R. 56.1(d) (emphasis
added). Owens cites no evidence that the disciplinary letters were "based on falsehoods" or
violated a collective bargaining agreement.

Further, even taking Owen at her word, a thorough review suggests that, in fact, she
does not dispute many of defendants' criticisms of her. To take one example, Owens does
not dispute that, during a March 2013 meeting, Zeimer met with Owens and her union
representative to discuss "time and attendance issues." (DOE Rule 56.1 Statement ¶ 36.)
Nor does she appear to dispute many of the allegations raised at that meeting—namely, her
failure to attend staff meetings and her missing a grading deadline. (*See* Owens Rule 56.1
Resp. ¶ 36.) Instead, she disputes only one of Zeimer's assertions—that she was late to one
meeting—and "adds that Zeimer acknowledged that [Owens's] alleged time issues ha[d]

improved." (*Id.*) That does not address the crux of Zeimer's concerns: that she had repeatedly missed meetings and deadlines.

Additionally, Owens "does not dispute" that she was issued a performance improvement plan (Owens Rule 56.1 Resp. ¶ 49), which noted several "pedagogical deficiencies," including "[u]nsatisfactory attendance and punctuality" (Action Plan at 1). Instead, she contends only that "this plan did not outline steps for improvement and the support listed in the plan did not occur." (Owens Rule 56.1 Resp. ¶ 49.) Again, what does not appear to be disputed are the underlying deficiencies and performance issues enumerated in the action plan itself.

Similarly, in February 2014, Zeimer conducted an observation of Owens's class during which Owens "did no more than discuss a picture and have a Spanish speaker read a 69 word paragraph" and "did not appear to have any plan in mind for this lesson." (DOE Rule 56.1 Statement ¶ 55.) Owens does not dispute Zeimer's description of her class but instead asserts that "she had submitted a lesson plan as required." (Owens Rule 56.1 Resp. ¶ 55.) Apart from failing to address the substantive criticism of her class, Owens's assertion that "she had submitted a lesson plan" is misleading. Zeimer's evaluation specifically notes that Owens "submit[ted] a lesson plan via email at 2:18AM the following morning" but was "unable to produce any planning documentation" when Zeimer and Owens "met for 54 minutes directly after the lesson." (June 2014 Evaluation at 7.) Thus, Owens's phrasing— "that she had submitted a lesson plan as required" (Owens Rule 56.1 Resp. ¶ 55)—does not actually conflict with the content of Zeimer's evaluation.

Finally, Owens does not address—at all—her receipt of a "U" rating for the 2012–2013 school year due to an "overwhelming number of days late" and "evidence of poor instruction," among other matters. (DOE Rule 56.1 Statement ¶ 44; *accord* Annual Performance Review at 1.) She claims, without the proverbial scintilla of support, that "Zeimer created most of the 'evidence' to support his rating after submitting the observation" but does not state which allegations were allegedly fabricated.

In sum, no jury could reasonably conclude that defendants' reasons for any adverse actions were pretextual, because the record is bulging with performance issues, many, if not most, of which are undisputed by Owens.

### 2. *Disability Discrimination*

Owens has raised disability discrimination claims based on three statutes: (1) the ADA (against the DOE only), (2) the NYSHRL, and (3) the NYCHRL. As with Owens's religious discrimination claims, her disability discrimination claims cannot survive summary judgment because Owens has established neither a prima facie case nor that her employer's nondiscriminatory reasons for its actions were pretextual. Owens's claim can be

17

characterized as both a disability discrimination claim and a failure-to-accommodate claim. The Court addresses each in turn.

### a. *Owens has not established a prima facie case of disability discrimination*

To establish a prima facie case of disability discrimination, a plaintiff must adduce sufficient evidence that would allow a jury to find that (1) her employer is subject to the a governing statute (in this case, the ADA, NYSHRL, and NYCHRL); (2) she was disabled; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013); *see also Attis v. Solow Realty Dev. Co.*, 522 F. Supp. 2d 623, 627 (S.D.N.Y. 2007).

As with Owens's religious discrimination claim, defendants contend—and the Court agrees—that Owens cannot establish a prima facie case because she did not suffer an adverse employment action within the statute of limitations and because any adverse action was not suffered because of her disability. *See supra* Sections II.C.1.a.i–ii. With respect to her disability discrimination claim more specifically, defendants contend that Owens was not disabled or otherwise qualified to perform the essential functions of her job.

Owens's claimed disabilities are ADHD and hidradenitis suppurativa. Other district courts in this circuit have generally held that ADHD is a disability for purposes of the ADA, *see, e.g., Geoghan v. Long Island R.R.*, No. 06 CV 1435 (CLP), 2009 WL 982451, at *10 (E.D.N.Y. Apr. 9, 2009), and Owens has adduced evidence that would allow a jury to conclude that ADHD substantially limits her major life activities. (*See* DOE Rule 56.1 Statement ¶¶ 97–99.) Similarly, Owens claims that her hidradenitis "caus[es] shooting pain, impacting Owens' ability to walk," which may be sufficient to allow a jury to conclude that she was disabled. (Owens DOE Opp'n at 15; *see also* DOE Rule 56.1 Statement ¶ 96.) The Court need not determine whether plaintiff is disabled, however, because the evidence is overwhelming that she was unable to perform such essential functions of her job as arriving at work on time and meeting deadlines.

Notably, Owens does not address her failure to meet deadlines at all, a deficiency that dooms her disability discrimination claim. Owens instead focuses only on her late arrivals, arguing that she "did not miss any instructional time due to her lateness" and that "[s]he did not miss any proctoring assignments and she did not miss any activities in the middle of the day." (Owens DOE Opp'n at 15.) That, however, is irrelevant. She does not dispute that she repeatedly arrived to work late, month after month, year after year, and her regular, continued, and confounding tardiness is amply supported by the record. (*See, e.g.*, DOE Rule 56.1 Statement ¶ 7; Owens Rule 56.1 Resp. ¶ 7.)

18

There is no question here that punctuality was an essential function of Owens's job. As the Second Circuit has noted, "a timely arrival is normally an essential function." *McMillan*, 711 F.3d at 126. The DOE's job description for a teacher in Owens's position confirms this requirement, expressly stating that a "successful candidate will provide: demonstrated punctuality and ability to meet strict deadlines." (DOE Rule 56.1 Statement ¶ 19.) And the record reflects that, since at least March 2012, Owens has received multiple, repeated warnings about her tardiness. (*See, e.g.*, *id.* ¶¶ 18, 20, 31.) There is absolutely no basis in this record upon which a reasonable jury could conclude that Owens's job requirements permitted late arrivals.

Owens raises an intriguing question: in light of the fact that she is still employed by the DOE as a teacher, how can it be that she is unable to perform her job? (Owens DOE Opp'n at 16.) That question can only be answered by the DOE. Owens's continued employment is certainly relevant for purposes of summary judgment, but it is insufficient, on its own, to create a dispute of material fact. After all, it is possible that an employee can remain employed despite being demonstrably unqualified for the position. *See Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 565 (2d Cir. 2000). Here, the record overwhelmingly establishes that arriving at work on time and meeting deadlines were essential functions of Owens's job that she was unable to perform.

In sum, because Owens has not established that she was able to satisfy the essential functions of her job, she cannot establish that she was "otherwise qualified" for her position. That, on top of her failure to demonstrate an adverse employment action, means that she has not made out a prima facie case of disability discrimination.

### b. *Owens has not established a prima facie case of a failure to accommodate*

Alternatively, a plaintiff can establish a prima facie case of disability discrimination arising from an employer's failure to accommodate by showing that (1) she was disabled; (2) her employer is covered by a governing statute and had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of her job; and (4) her employer refused to make such accommodation. *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)); *see also Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016). Here, defendants contend that the third and fourth elements are not satisfied.

As to the third element—whether Owens could perform the essential functions of her job with reasonable accommodation—defendants urge that "there is no way for defendants to reasonably accommodate [Owens's] inability to arrive on time in the morning and to her mid-day assignments." (DOE Mem. at 14.) The Court agrees.

19

"[T]he plaintiff bears the burden of proving . . . that an accommodation exists that permits her to perform the job's essential functions." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) Critically, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon*, 332 F.3d at 100.

As defendants note, "[w]hen asked whether there is 'anything that would have helped [her] get to work on time,' plaintiff testified "there's no automatic fix to processing time when that's a symptom of your ADHD." (DOE Mem. at 14 (quoting DOE Rule 56.1 Statement ¶ 99).) Similarly, Owens also stated that her hidradenitis could "surface or erupt at any time" and that "there's no pattern to it." (DOE Rule 56.1 Statement ¶ 99.) Indeed, in a March 2012 letter to Zeimer, Owens wrote, "[M]y chronic condition can affect me at any time, without advance notice, and can result in arriving late to work." (Letter from Catherine Owens to Nadav Zeimer at 1, Kamen Decl. Ex. V, ECF No. 67-22.) And there is no suggestion from Owens that there was in fact some accommodation that would have allowed her to arrive at work on time. *See Aquinas v. Fed. Exp. Corp.*, 940 F. Supp. 73, 79 (S.D.N.Y. 1996) ("[A] disabled employee who cannot get to work as often as her employer requires is not 'otherwise qualified' for her job under the ADA, and her employer is not required to make allowances for her absenteeism.").

As to the fourth element—whether the DOE refused to reasonably accommodate Owens—defendants claim that the "DOE never refused an accommodation request made by [Owens]." (DOE Mem. at 16; *see also* DOE Rule 56.1 Statement ¶ 95.) Owens responds that she did made certain requests that the DOE denied—specifically, "Owens' request to teach in a single classroom or classrooms on a single floor." (Owens DOE Opp'n at 16.) But Owens's request was in fact that she be allowed to "teach in one classroom or on one floor" or be provided "a cart if [she was] not to get a classroom." (DOE Rule 56.1 Statement ¶ 83.) Zeimer denied only her request for a single classroom or floor; he granted the request for a cart. (*Id.*; Owens Rule 56.1 Resp. ¶ 83.) As defendants correctly state, "[e]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll v. IBM Corp.*, 787 F.3d 89, 95 (2d Cir. 2015). Owens does not explain why the provision of a cart—a request she herself made—was not a reasonable accommodation.

Moreover, "[r]easonable accommodation may take many forms, but it must be effective." *Id.*; *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002). Here, it is far from evident how a single classroom or classrooms on a single floor would have alleviated the disabilities causing Owens's attendance problems, particularly her failure to arrive at work on time in the morning. Such a change would not, therefore, constitute an *effective* accommodation. Thus, that request cannot be considered an accommodation request, and

defendants are correct in stating that no reasonable accommodation requested by Owens was ever denied.

### 3. *Retaliation*

Although Owens raises retaliation claims under five different statutes—section 1983, the ADA, Title VII, the NYSHRL, and the NYCHRL—the elements of a prima facie case of retaliation are essentially the same: she must show that (1) she engaged in protected activity, (2) her employer was aware of this activity, (3) her employer took adverse employment action against her, and (4) a causal connection exists between the alleged adverse action and the protected activity. *Kwan*, 737 F.3d at 844 (Title VII and NYSHRL); *see also Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (§ 1983); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA). "The elements of retaliation under the NYCHRL differ only in that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (quoting *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 509 n. 12 (S.D.N.Y. 2010)).

Although Owens did not suffer any adverse employment action for purposes of her discrimination claims, *see supra* Section II.C.1.a.i, it is well-established that the definition of an adverse employment action is broader for retaliation than for discrimination. A plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)).

Given that standard, there is sufficient evidence for a jury to reasonably conclude that Owens suffered an adverse action for purposes of a retaliation claim. Several events that are not time-barred, such as the negative performance reviews issued by Zeimer, might constitute adverse actions supporting a retaliation claim. *See, e.g.*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) ("[O]f course, a poor performance evaluation could very well deter a reasonable worker from complaining."); *Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 539 (S.D.N.Y. 2016) ("[U]nder this generous standard, a negative performance review can constitute an adverse action for purposes of a retaliation claim."); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008).

However, Owens cannot show that any adverse actions suffered were causally connected to her protected activity. Here, the alleged protected activity is Owens's filing of OEO complaints in 2013 and 2016. (DOE Rule 56.1 Statement ¶¶ 43, 77.) But Owens's poor

performance is documented in this record well before the filing of her OEO complaints. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

Owens writes that "[s]hortly after her first complaint, Zeimer greatly increased the amount of letters he issued to Owens' file." (Owens DOE Opp'n at 18.) Thus, she contends, "[t]his is not a case where 'gradual adverse job actions began well before' Owens complained, but rather a severe escalation." (*Id.* at 18–19.) This argument appears to rely on the Second Circuit's use of the phrase "gradual adverse job actions" in *Slattery. See Slattery*, 248 F.3d at 95. Owens misunderstands *Slattery*, the holding of which is simple: where adverse actions precede the protected activity, one cannot infer based solely on the timing of events that the protected activity caused the adverse actions. *See id.* Whether the rate of adverse actions increased after the protected activity is irrelevant.

On the record presented, no reasonable jury could conclude that any adverse actions she suffered were causally connected to her protected activity. Owens's performance issues existed before she engaged in protected activities. Indeed, she "was repeatedly warned by the defendants that her performance and attendance problems were going to lead to a negative rating and could result in other disciplinary actions." (DOE Reply at 8.) Thus, Owens cannot establish a prima facie case of retaliation.

### D. Hostile Work Environment Claims

Owens also alleges that defendants discriminated against her based on her religion and disability by creating a hostile work environment. Those claims are brought under five different statutes: section 1983, the ADA, Title VII, the NYSHRL, and the NYCHRL. Defendants claim that they are entitled to judgment as a matter of law because Owens has not established a sufficiently hostile work environment or that the environment occurred because of a protected characteristic.

The standard for the first four statutory claims—section 1983, the ADA, Title VII, and the NYSHRL—are the same: to establish a hostile work environment claim "a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (Title VII); *see also Naumovski*, 934 F.3d at 212 (section 1983); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (ADA); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (NYSHRL).

Here, it is manifest that the conditions of which Owens complains are insufficiently "severe and pervasive" to amount to an "abusive working environment," and thus those conditions cannot support a claim under the first four statutes. The standard for a hostile work environment under the NYCHRL, however, is more generous. New York courts have held that the NYCHRL rejects the "severe and pervasive" standard and instead asks "whether the plaintiff has proven by a preponderance of the evidence that she has been treated *less well* than other employees because of her [protected characteristic]." *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (App. Div. 2009) (emphasis added).

However, regardless of whether Owens has made such a lessened showing, her hostile work environment claims founder on another ground: she has failed to proffer evidence from which a reasonable jury could conclude that any "hostility" in her work environment was owed to a protected characteristic. For the reasons discussed above, the record amply supports defendants' contention that the actions of which Owens complains were not discriminatory but were rather based on a legitimate, nondiscriminatory reason: her poor performance and attendance. There is no reasonable basis for a jury to conclude otherwise.

## III. CONCLUSION

For the litany of reasons set forth above, the Court grants summary judgment in favor of defendants on all claims.

Dated:  New York, New York
       August 30, 2021

SO ORDERED:

Sidney H. Stein, U.S.D.J.